UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 2:18-CR-00355 |
| | * | |
| VERSUS | * | JUDGE |
| | * | |
| ERIC J. RICHARD        (01) | * | MAGISTRATE JUDGE KAY |

**UNITED STATES' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO SUPPRESS**

NOW INTO COURT, comes the United States of America, by and through the undersigned Assistant United States Attorney, who responds in opposition to defendant Richard's ("Richard") motion to suppress.  For the following reasons, the traffic stop, use of a canine to perform a vehicle sniff, and subsequent search of Richard's vehicle did not violate the Fourth Amendment of the United States Constitution.

**FACTS AND PROCEDURAL HISTORY**

On October 25, 2017 at approximately 8:51 p.m. State Trooper Luke Leger observed a white Buick Lacrosse traveling eastbound in the outside (left-hand) lane on Interstate 10 near milepost 15.  Trooper Leger noticed two traffic infractions: first, the vehicle followed a flatbed trailer hauling stone materials too closely in violation of LA. REV. STAT. § 32:81, and second, part of the vehicle's license plate was obscured from view in violation of LA. REV. STAT. § 32:53(A)(3).  Trooper Leger activated his emergency lights, and the Buick pulled over to the shoulder of the Interstate and parked.  Trooper Leger called the license plate number for the Buick into dispatch.

1

Ex. 1 at 0:44.[1]  Prior to interacting with the driver, Trooper Leger used the computer inside his unit to check the Buick's license plate on a system that tracks vehicles as they cross the border between Louisiana and Texas on Interstate 10.  Trooper Leger noticed that the system registered the Buick crossing from Louisiana into Texas (westbound) earlier that day and later crossing from Texas into Louisiana a short time before Trooper Leger observed the Buick's traffic violations.

The driver of the Buick exited the vehicle and walked toward Trooper Leger's unit.  Ex. 1 at 1:06. Trooper Leger and the driver greeted one another and shook hands. Ex. 1 at 1:15.  Trooper Leger noted the driver's hand felt clammy, and Trooper Leger would later document this observation in his report.   Leger explained to the driver that he stopped the vehicle because it had followed a flatbed truck too closely and, in addition, had an obstruction over the license plate. Ex. 1 at 1:18-1:35.  Trooper Leger requested to see the driver's identification, and the driver complied. Ex. 1 at 1:38-1:39.  Trooper Leger identified the driver as Richard.

Next, Trooper Leger asked, "Where you coming from, man?"  Richard responded, "I was coming from my job right there in Vinton."  Ex. 1 at 1:44-1:46.  Knowing that Vinton is located in Louisiana, Trooper Leger noted that Richard's response did not match the data for the Buick from the system tracking vehicles crossing the Louisiana/Texas border.  Richard told Trooper Leger that he works at "Global" and that Global is "an energy…a light company." Ex. 1 at 2:00.  Leger asked

---

[1] Citations to Ex. 1 refer to the video file submitted as Exhibit 1 along with this memorandum.  The video depicts dash camera and body microphone footage of the incident at issue.  Pinpoint citations to the video will include the timestamp on the video file, *e.g.* "Ex. 1 at 0:44" refers to 44 seconds into the video footage.

Richard if he had paperwork for the vehicle, and Richard stated that he did.  Richard returned to the Buick as Trooper Leger followed him.

Richard opened the passenger-side door to retrieve the paperwork for the vehicle.  Ex. 1 at 2:15.  Richard handed Trooper Leger a title for the vehicle—but no registration documentation—and Richard closed passenger-side door. Ex. 1 at 2:26-2:39.  Richard then walked to the driver's side of the vehicle, opened the door, and re-entered the vehicle.  As Richard entered the driver's side, Trooper Leger stood outside of the vehicle on the passenger side, and he used his flashlight to see inside the vehicle's interior through the front passenger-side window.  Ex. 1 at 2:44 – 3:00.

At this point, Trooper Leger told Richard to come back to the rear of the vehicle, and Richard complied.  Ex. 1 at 2:58.  Trooper Leger asked Richard, "Whose car is this?," and Richard responded, "It's a dealership, I own it." Ex. 1 at 3:04-3:06.  Trooper Leger asked if Richard worked at the dealership full time, and Richard stated, "No." Ex. 1 at 3:11-3:13.  Trooper Leger noted that this was an odd response given that Richard had claimed earlier to work for a "Global" in Vinton.  After a brief exchange concerning the car dealership, Trooper Leger asked Richard whether he had ever been "arrested" or "locked up." Ex. 1 at 3:25.  Although it was night, the conversation, at this point, took place directly in front of Trooper Leger's unit, and the headlights of the unit provided sufficient light for Trooper Leger to see Richard's face and reactions to questions.  In response to questions, Trooper Leger noted that Richard's carotid artery began pulsating rapidly.

Immediately after asking about ownership of the vehicle and the driver's criminal history, Trooper Leger asked Richard if he had any guns or illegal narcotics in the car.  Richard responded that he did not.  Ex. 1 at 3:49.  Then, Trooper Leger asked Richard, "You would care if I looked in your car?"  Richard responded, "You can look through here," and Richard gestured toward the rear-window of the vehicle. Ex. 1 at 4:02-4:08.  Trooper Leger then asked if Richard had ever had any drug charges.  Richard responded that he had not.  Ex. 1 at 4:13-4:15.  Then, Trooper Leger asked, "You don't mind popping the trunk for me?"  Ex. 1 at 4:16.  Richard returned to the driver's side of the vehicle to open the trunk, and Trooper Leger walked toward the passenger-side of the vehicle.  Richard unlatched the trunk, and walked back to the trunk of the Buick.  Trooper Leger used his flashlight to look through the vehicle's window inside the back seat of the vehicle, and he noticed a black duffel bag on the rear passenger seat floor board.  Ex. 1 at 4:33.  Trooper Leger then asked Richard about the black bag inside the Buick:

| | |
|---|---|
| Leger: | What's in this bag back here, man? |
| Richard: | [No Response]. |
| Leger: | What's in that bag back here? |
| Richard: | Huh, Work clothes. |
| Leger: | Work clothes? … I can look in it? |
| Richard: | [No response]. |
| Leger: | I can look in it? |
| Richard: | [No response]. |
| Leger: | You don't mind if I look in that bag? |
| Richard: | Huh? |
| Leger: | You don't mind if I look in that bag? |
| Richard: | Oh, well I can open it. |

Leger:        Well there you go.

Ex. 1 at 4:45-5:05.

Richard opened the door and leaned inside the vehicle, and Trooper Leger leaned over Richard in order to observe what Richard was doing to ensure that Richard was not accessing a weapon.   Trooper Leger noticed that Richard was shaking as he opened the bag to show Trooper Leger its contents.   As Trooper Leger watched Richard manipulate the contents of the bag, Trooper Leger believed that Richard was trying to cover something up in the bottom of the bag with a shirt that was also inside the bag.   During this interaction, Trooper Leger continued to ask Richard about the contents of the bag, specifically if there was a gun in the bag.   Ex. 1 at 5:20.   Richard continued to maintain that the bag contained only work clothes. Then, Trooper Leger stated, "Set that bag up here for me." Ex. 1 at 5:38.   Richard zipped up the bag, took it out of the car, and turned toward Trooper Leger holding the closed bag.   During this portion of the encounter, Trooper Leger asked repeatedly if there was a gun inside the bag.   Richard stated no.   Trooper Leger then took the bag from Richard, placed it on the trunk of the car, and told Richard, "I won't search it if you don't want me to look at it, alright." Ex. 1 at 5:58.   Trooper Leger placed the bag back inside the vehicle, closed the door, and told Richard to stay away from the bag because "it feels heavy to me like it might be a gun." Ex. 1 at 6:16.

Trooper Leger then returned to his unit, and suspecting that the bag contained some form of contraband, either a gun or narcotics, he called for a canine unit to come

to his location.  Ex. 1 at 7:07.  Immediately thereafter, Trooper Leger requested that dispatch run a criminal history search for Richard. Ex. 1 at 7:24.

Before dispatch provided Richard's criminal history as requested, Trooper Moseley arrived at the scene with canine Pita. Trooper Leger then told Richard that Trooper Moseley was going to have the canine perform a sniff around the vehicle. Canine Pita began to sniff around the vehicle. Ex. 1 at 13:08.  Shortly thereafter, Trooper Moseley told Trooper Leger that canine Pita positively alerted. Trooper Leger searched Richard's vehicle, and inside the black duffle bag, Trooper Leger found a kilogram of cocaine.  Trooper Leger arrested Richard and read Richard his *Miranda* rights.

On December 13, 2018, a grand jury indicted Richard for one count of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1).  Doc. No.  1.  On May 22, 2019, Richard filed a motion to suppress.  Doc. No. 20.

In his motion to suppress, Richard argues that Trooper Leger did not have justification to stop the Buick or reasonable suspicion to justify prolonging the traffic stop beyond the time necessary to investigate the traffic violations.  For that reason, Richard argues, the subsequent search of Richard's vehicle violated the Fourth Amendment of the United States Constitution because Richard refused to give consent to search his vehicle.

Richard's motion should be denied for two independent reasons. First, Richard's traffic and equipment infractions justified the initial stop, reasonable suspicion supported the use of canine Pita, and canine Pita's alert provided probable

cause to search the vehicle.   Second, canine Pita's alert occurred prior to the completion of the routine tasks associated with the traffic stop, and therefore, the canine sniff did not unreasonably prolong an otherwise lawful traffic stop.

## LAW AND ARGUMENT

I.   **RICHARD'S TRAFFIC INFRACTIONS JUSTIFIED THE INITIAL STOP.  SHORTLY THEREAFTER, TROOPER LEGER DEVELOPED REASONABLE SUSPICION THAT RICHARD'S VEHICLE CONTAINED CONTRABAND.  FINALLY, A CANINE ALERT PROVIDED PROBABLE CAUSE TO SEARCH RICHARD'S VEHICLE.**

The Fourth Amendment guarantees individuals the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. It is well established that when police stop of a vehicle and detain its occupants a seizure has occurred under the Fourth Amendment.  *See United States v. Jones*, 234 F.3d 234, 239 (5th Cir.2000).  Courts analyzed legality of such stops under the familiar standard established in *Terry v. Ohio*, 392 U.S. 1 (1968). *See also*, *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir.2004) (*en banc*).

The *Terry* analysis for a traffic stop is a two part test: "First, we examine whether or not the officer's decision to stop the vehicle was justified at its inception. Second, we determine whether the officer's subsequent actions were reasonably related in scope to the circumstances that caused him to the stop the vehicle in the first place." *United States v. Pack*, 612 F.3d 341, 350 (5th Cir.2010) (internal citations omitted).  Stated differently, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'−to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United*

*States*, 135 S. Ct. 1609, 1614 (2015). "Authority for the seizure thus ends when tasks tied to the traffic infraction are−or reasonably should have been−completed." *Id.*

Although an officer may not in all circumstances detain a motorist beyond the time necessary to address the traffic violation, if during the stop an officer develops reasonable suspicion of other criminal activity, then an officer may prolong the detention of the motorist for as long as reasonably necessary to confirm or dispel their reasonable suspicion. *See Pack*, 612 F.3d at 350.  Because "detention, not questioning, is the evil at which *Terry's* second prong is aimed," officers conducting a traffic stop may question the driver on certain items unrelated to the reason for the stop.  *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir.1993).  The Fifth Circuit has held that officers may incident to a traffic stop run checks on drivers' licenses and vehicle registrations, seek proof of automobile insurance, run computer checks, check for outstanding warrants against the driver, and inquire into the driver's itinerary and purpose for the trip. *Pack*, 612 F.3d at 350.

In order to determine whether an officer has developed reasonable suspicion to prolong a traffic stop, a reviewing court "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273–74 (2002).  "Reasonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the... seizure."  *Pack*, 612 at 352 (quoting *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir.2006)).  The Supreme Court instructs that in

evaluating whether or not an officer's suspicion is reasonable, "due weight must be given ... to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry*, 88 S. Ct. at 1883. "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Arvizu*, 534 U.S. at 273.

Initially, Trooper Leger began following the Buick because he observed it following another vehicle too closely in violation of LA. REV. STAT. § 32:81.[2] While following the vehicle, Trooper Leger noticed the Buick's license plate had an obstruction in violation of LA. REV. STAT. § 32:53(A)(3).[3]

Richard's motion claims that Trooper Leger did not have sufficient initial justification for the stop. Richard alleges that the traffic violations are not visible on the dash-camera footage. First, dash-camera footage, while helpful at times, will not always capture a traffic violation. Second, the dash-camera footage corroborates Trooper Leger's observations. When the dash-camera footage begins, the Buick is seen changing lanes from the center lane into the right-hand lane moving directly in front of what appears to be a truck or a flatbed—this is the flatbed trailer that Trooper Leger referenced in his interactions with Richard. Ex. 1 at 0:01-0:02. Trooper Leger passes the flatbed and pulls in behind the Buick, which pulls over to the shoulder of

---

[2] LA. REV. STAT. § 32:81 states in pertinent part: "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicle and the traffic upon and the condition of the highway."
[3] LA. REV. STAT. § 32:53(A)(3) states in pertinent part, "Every permanent registration license plate shall at all times [...] be maintained free from foreign materials and in a condition to be clearly legible."

the Interstate.  Then, the flatbed can be seen passing the stopped vehicles.  Ex. 1 at 0:40.  Although the initial traffic infraction is not captured on the dash-camera footage, what is captured is consistent with what Trooper Leger observed, *i.e.* that the Buick was following the flatbed too closely, and the Buick passed the flatbed just prior to Trooper Leger pulling onto the Interstate.  Therefore, Richard's traffic infraction of following too closely justified the initial stop.

In addition, a second reason justified the initial stop—the Buick's license plate cover obscured from view the bottom portion of the license plate.  *See* Ex. 2.  Because the bottom portion of the license plate was covered by a foreign object and not legible, the license plate was not "free from foreign materials and in a condition to be clearly legible" as required by LA. REV. STAT. § 32:53(A)(3).  Therefore, Richard's equipment violation justified the initial stop.

Now, we must consider whether Trooper Leger developed reasonable suspicion to prolong the stop beyond the time necessary to resolve the issues concerning the initial stop.  Almost immediately after the stop, Trooper Leger asked Richard about his itinerary, and Richard's answer did not match the data provided by Trooper Leger's computing system for the Buick.  Richard's apparent lie provided Trooper Leger with a reason to ask more questions of Richard and inquire into whether some other form of criminal activity was afoot.  When considered in tandem with the other indicators of criminal activity, Richard's response about his itinerary gave rise to reasonable suspicion.  Those other indicators include:

- Richard's presence in a drug trafficking corridor (Interstate 10 eastbound)
- Driving away from a major drug distribution hub (Houston, Texas)

- Nighttime travel
- Walking away from the Buick and toward Trooper Leger's unit
- Richard's clammy hand when he shook Trooper Leger's hand
- No registration for the vehicle, only a title
- Claiming to be the owner of the car dealership despite also claiming to work for "Global" in Vinton
- Lack of an accurate or detailed description of his job at "Global"

Trooper Leger did not stop with these facts before calling Trooper Moseley and canine Pita.  Indeed, Trooper Leger continued to investigate his suspicions and further support his belief that some form of contraband was inside the Buick.  Upon further interactions, Trooper Leger noticed the following:

- Richard ignoring initial questions concerning the black bag
- Unusual nervousness concerning questions about the black bag
- Pulsating carotid artery during questioning
- Richard visibly shaking as he manipulated the contents of the bag
- As Richard manipulated the contents of the bag, his appearing to hide something inside the black bag with a shirt

The interactions about the black bag in the back seat all but confirmed Trooper Leger's suspicions that there was some form of contraband inside that bag, either a gun or narcotics.  Because the bag potentially contained a weapon, Trooper Leger needed to exert sufficient control over the situation to ensure his and Richard's safety.

At this point in the interaction, as is evident on the dash-camera footage, Richard manipulated the contents of the bag and his hands were inside the Buick's rear passenger-side door.  Trooper Leger looked over Richard's back to attempt to see what is inside the bag.  Then, Trooper Leger told Richard to "set that bag up here for me."  It is clear that during the interaction, Trooper Leger was concerned about the

black bag containing a gun or narcotics.  In fact, Trooper Leger asked repeatedly if the bag contained a gun.  Richard's responses and demeanor concerning the questions about whether the bag contained a firearm did nothing to alleviate Trooper Leger's concerns.  Quite the contrary, Richard's nervousness escalated when Trooper Leger asked about a gun, and Richard visibly shook as he manipulated the bag.

Richard claims that this interaction violated Richard's rights under the Fourth Amendment.  As the Supreme Court has long recognized, "protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger[.]"  *Michigan v. Long*, 463 U.S. 1032, 1048 (1983).  Indeed, "roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect."  *Id*.  For these reasons, a search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible when a police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons."  *Id* (internal quotations omitted).

Under the instant circumstances, allowing Richard to continue manipulating a bag in this setting was unsafe for both Richard and Trooper Leger.  It was evident to Trooper Leger that the bag contained some form of contraband.  Due to the potential that the black bag contained a gun, any reasonable officer in similar circumstances must exert sufficient control of the situation, and the bag, in order to

12

ensure their own personal safety as well as that of the other individual. Consequently, Trooper Leger's instruction to "set the bag up here" was one consistent with maintaining officer safety while at the same time respecting Richard's rights under the Fourth Amendment.  Indeed, immediately after taking control of the bag, Trooper Leger informed Richard, "I won't search it if you don't want me to look at it, alright." Ex. 1 at 5:58.  In order to maintain the safety of the situation, Trooper Leger placed back inside the Buick and told Richard to stay away from the bag because "it feels heavy to me like it might be a gun." Ex. 1 at 6:16.

By maintaining a calm and cordial demeanor toward Richard—in spite of suspicions that the black bag contained a gun or narcotics and Richard increasing nervousness—Trooper Leger's actions did not escalate the situation.  Rather, Trooper Leger commendably tailored his requests concerning the black bag to ensure officer safety, alleviate a potential threat, and at the same time, show proper respect for Richard's Fourth Amendment rights.  Having ensured that the situation was safe to return to his unit, Trooper Leger then called for a canine to confirm or dispel his suspicion concerning contraband inside the Buick, while at the same time, handling the routine tasks associated with a traffic stop.

The interactions and circumstances outlined above provided reasonable suspicion to prolong the traffic stop.  The following facts supported that reasonable suspicion: 1) Richard's clammy hand; 2) Richard's lie to Trooper Leger concerning his itinerary (claiming to be on his way back from work in Vinton when Trooper Leger's computer query showed the vehicle crossing the Texas/Louisiana border earlier that

day); 3) travel at night on a drug trafficking corridor near a major drug trafficking hub, Houston, Texas; 4) Richard's walking away from the Buick toward Trooper Leger's unit; 5) lack of an accurate or detailed description for his claimed employment; 6) Richard's claim to work for "Global" in Vinton while also claiming to own a car dealership; 7) the lack of registration information for the Buick; 8) ignoring questions concerning the black bag inside the vehicle; 9) extreme nervousness; and 10) appearing to hide something inside a black bag.  All these facts taken together caused Trooper Leger to form reasonable suspicion that the bag contained a gun or narcotics.

Under similar circumstances, the Fifth Circuit has held that reasonable suspicion existed to prolong a traffic stop.  For instance in *Untied States v. Pack*, the Court held that an officer's observation of a nervous driver, lies concerning itinerary, and travel on a drug trafficking corridor were sufficient to support reasonable suspicion to prolong a traffic stop for the purpose of a canine sniff.  *Pack*, 612 F.3d 361.  *See*, *also*, *United States v. Andres*, 703 F.3d 828, 834 (5th Cir. 2013) (a subject's untruthful answer concerning where he was driving from created suspicion justifying continued detention and investigation); *United States v. Rodriguez-Flores*, 249 F. App'x 317, 321 (5th Cir. 2007) (unpublished) (finding reasonable suspicion existed where a subject told an implausible story about his itinerary, lied about his arrest record, lied about his time of entry into the United States, and had recently crossed the border from Mexico, a common origin of illicit drugs).

Having developed reasonable suspicion, Trooper Leger called for his colleague Trooper Moseley to perform a canine sniff around the vehicle, and at the same time, Trooper Leger requested dispatch to run a criminal history on Richard.  Before the criminal history returned, Trooper Moseley and canine Pita completed the sniff–less than fourteen minutes after Trooper Leger activated his emergency lights to pull over Richard's Buick.

Finally, canine Pita's alert to the presence of narcotics inside the vehicle provided the probable cause necessary to perform a search of the vehicle.   The well-established automobile exception allows police to stop and search a vehicle without obtaining a warrant if they have probable cause to believe it contains contraband. *See California v. Carney*, 471 U.S. 386, 392–93 (1985).   Also, "[t]he fact that the dog alerted provided probable cause to search." *United States v. Williams*, 69 F.3d 27, 28 (5th Cir.1995).   For these reasons, Richard's motion to suppress should be denied.

II. **EVEN IF OFFICERS LACKED REASONABLE SUSPICION, OFFICERS DEVELOPED THE PROBABLE CAUSE TO SEARCH THE VEHICLE PRIOR TO THE RETURN OF A CRIMINAL HISTORY RECORDS CHECK; THEREFORE, THE INITIAL INTERACTION AND CANINE SNIFF DID NOT EXTEND THE STOP LONGER THAN NECESSARY TO PERFORM ROUTINE TASKS ASSOCIATED WITH A VALID TRAFFIC STOP.**

The Fifth Circuit has outlined the routine tasks and checks officers may perform automatically upon making a lawful traffic stop. *See Brigham*, 382 F.3d at 507–08.  Those include computerized driver's license and registration checks.  *Id.* at 510.  In *United States v. Pack*, the Fifth Circuit rejected a defendant's contention that running computerized checks, including a criminal history on the occupants of a

vehicle, unjustifiably prolonged the traffic stop. *Pack*, 612 F.3d at 351. *Pack* recognized:

> In *United States v. Brigham*, in which we stated that, "within the legitimate scope of the stop were the registration and license checks [that the police officer] … initiated on the vehicle and its occupants." […] [T]his language settled the issue of whether or not it was permissible to ask [an occupant of a vehicle] to identify himself and to run computer checks on his driver's license and background.

*Pack*, (quoting *Brigham*, 382 F.3d at 509; internal citations omitted).

To be sure, an officer's "authority for the seizure ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.  [A traffic stop] become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission [of the initial stop]." *Rodriguez*, 135 S. Ct. at 1611.  However, the Supreme Court has also held that when officers perform a dog sniff on the exterior of a subject's vehicle while that vehicle is lawfully seized for the purpose of a traffic violation, the dog sniff "does not rise to the level of a constitutionally cognizable infringement." *Illinois v. Caballes*, 543 U.S. 405, 409 (2005).  Taken together *Rodriguez* and *Caballes* stand for the proposition that an officer may perform a dog sniff, even absent reasonable suspicion, if the dog sniff does not prolong the traffic stop beyond the time reasonably required to conduct routine tasks associated with a traffic stop.

Here, Trooper Leger's routine tasks included requesting information concerning itinerary, registration checks, and a computer check on Richard's criminal history.  Prior to the completion of these routine checks, Trooper Moseley arrived with canine Pita, and canine Pita provided probable cause to search Richard's Buick.

Because officers developed probable cause prior to completing routine tasks associated with the traffic stop, officers did not prolong the traffic stop beyond the time necessary to complete the routine tasks associated with the traffic stop. For this reason, Richard's motion to suppress should be denied.

## CONCLUSION

Richard's traffic and equipment infractions justified the initial stop.  Richard's answers to questions and his unreasonably suspicious behavior provided Trooper Leger with reasonable suspicion to call for canine Pita in order to dispel those suspicions.  Finally, canine Pita's alert provided probable cause for the search of the Buick.  For these reasons, Richard's motion to suppress should be denied.

Even if officers failed to develop reasonable suspicion, canine Pita's alert occurred prior to the completion of routine tasks associated with the traffic stop. Because canine Pita's sniff and alert did not prolong the stop beyond the time necessary to complete the routine tasks associated with the stop, Richard's motion to suppress should be denied.


Respectfully submitted,

DAVID C. JOSEPH
United States Attorney


By:    *s/Robert C. Abendroth*
ROBERT C. ABENDROTH, Bar # 32311
Assistant United States Attorney
800 Lafayette Street, Suite 2200
Lafayette, Louisiana 70501-7206
Telephone:  337-262-6618