UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 2:18-CR-00355 |
| VERSUS | : | JUDGE CAIN |
| ERIC J. RICHARD | : | MAGISTRATE JUDGE KAY |

**REPORT AND RECOMMENDATION**

Before the court is a Motion to Suppress [doc. 20] filed by defendant Eric J. Richard. Through this motion he seeks to suppress evidence obtained from a search of his vehicle. An evidentiary hearing on the motion was held before the undersigned on June 11, 2019. Doc. 24. The government elicited testimony from Troopers Luke Leger and Chet Moseley and video footage [doc. 25] from Trooper Leger's dash camera. Doc. 26. For the reasons stated below, we **RECOMMEND** that the Motion to Suppress [doc. 20] be **DENIED**.

## I.
### BACKGROUND

Evidence adduced at the hearing indicates that on October 25, 2017, Louisiana State Police Trooper Luke Leger stopped the defendant, Eric J. Richard, while traveling eastbound on Interstate 10 near the border between Louisiana and Texas. Trooper Leger stated that he initiated the traffic stop because Richard was following another vehicle too closely and Richard's license plate was obscured. After activating his emergency lights, Trooper Leger pulled over Richard's vehicle. Trooper Leger checked the vehicle's license plate on a computer system that tracks vehicles as they cross the border between Louisiana and Texas on Interstate 10. This check returned results

showing that Richard's vehicle crossed the border into Texas earlier that day and crossed into Louisiana a short time prior to the stop.

According to testimony elicited at the hearing, Richard exited his vehicle after the stop and began to walk towards Trooper Leger's patrol car. Doc. 26, Att. 1. Trooper Leger and Richard then shook hands at which point Trooper Leger noted Richard's hand felt "clammy." Trooper Leger informed Richard that he stopped his vehicle because Richard was following a flatbed truck too closely and the license plate on his vehicle was obstructed. After asking for Richard's driver's license, Trooper Leger asked Richard where he was coming from and Richard responded he had left his place of work in Vinton. Richard told Leger that he worked for "Global" and that Global is "an energy . . . a light company." Trooper Leger asked for the vehicle's documentation and they returned to the vehicle to retrieve the vehicle's documentation. Richard did not have the registration and only provided the vehicle's title. Trooper Leger then asked Richard who owned the vehicle, to which Richard answered that it belonged to a dealership which he owned. When asked whether he worked at dealership full time, Richard claimed that he did not.

Trooper Leger next asked Richard about his prior criminal history at which point he noticed Richard's carotid artery begin to rapidly pulsate. He then asked if Richard had any guns or illegal narcotics in the car to which Richard responded that he did not. Leger then asked Richard for permission to look inside of the car to which Richard agreed. He looked through one of the vehicle's windows with his flashlight and noticed a black duffel bag on the rear floorboard. Trooper Leger then questioned Richard about the duffel bag to which Richard initially failed to respond. Later, Richard stated that the duffel bag contained work clothes and agreed to allow Trooper Leger to look inside of it. While Richard was opening the bag, Trooper Leger noticed that Richard was shaking. According to the trooper's testimony, Richard manipulated the contents

of the bag such that Leger believed that defendant was attempting to mask or cover something up in the bottom of the bag.

While Richard was opening the bag, Trooper Leger questioned Richard about the contents of the bag, namely, whether it contained a gun. Richard continued to assert that the bag only contained work clothes. Leger then took the bag from Richard and set it on the trunk. After continuing to question Richard about the bag, Leger placed the bag back inside of Richard's vehicle and instructed Richard to stay away from the bag. The trooper testified the bag felt heavy to him, as though there might be a gun inside the bag.

Trooper Leger called for a canine unit due to his suspicion, founded on the defendant's behavior to that point, that the duffel bag contained a gun or narcotics. After calling for a canine unit, Leger called for a criminal history search on Richard. Before the criminal history search was completed, the canine unit arrived and Trooper Leger informed Richard that the canine was going to "sniff around the vehicle." Trooper Moseley testified that the canine's sniff yielded a positive alert, after which, Trooper Leger searched the vehicle and the duffel bag where he found a kilogram of cocaine. Richard was subsequently arrested and indicted by a grand jury for possession with intent to distribute cocaine.

## II.
## LAW & APPLICATION

### A. *Legal Authority*

The Fourth Amendment's protection of "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" includes "vehicle stops and temporary detainment of a vehicle's occupants." U.S. CONST. amend. IV; *U.S. v. Andres*, 703 F.3d 828, 832 (5th Cir. 2013). The constitutionality of a traffic stop is analyzed under the two part framework promulgated by the Supreme Court in *Terry v. Ohio*. *Terry v. Ohio*, 392 U.S. 1

(1968).  The *Terry* test requires courts to "determine whether the stop was justified at its inception," and, if so, "whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop of the vehicle in the first place."  *Andres*, 703 F.3d at 832 (quoting *United States v. Macias*, 658 F.3d 509, 517 (5th Cir. 2011)).  An analysis of a traffic stop under *Terry* also mandates that "courts . . . allow law enforcement officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."  *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (internal quotations omitted).

The initial inquiry under *Terry* is satisfied if the officer has "an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle."  *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). In addition, "[s]o long as a traffic law infraction that would have objectively justified the stop ha[s] taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic violation is irrelevant for purposes of the Fourth Amendment."  *Goodwin v. Johnson*, 132 F.3d 162, 173 (5th Cir. 1997).

The second portion of the *Terry* framework requires the "detention . . . be temporary and last no longer than is necessary to effectuate the purposes of the stop."  *Brigham*, 382 F.3d at 507. During the stop, "a police officer may permissibly examine the driver's license and registration and run a computer check on them to investigate whether the driver has any outstanding warrants and if the vehicle is stolen."  *Lopez-Moreno*, 420 F.3d at 430.  Such inquiry "may be wide-ranging."  *Id.* at 431.  In addition, officers "may also ask about the purpose and itinerary of a driver's trip during the traffic stop."  *U.S. v. Brigham*, 382 F.3d 500, 508 (citing *U.S. v. Gonzales*, 382 F.3d 755, 758-59 (5th Cir. 2003)).  However, "once all relevant computer checks have come

back clean, there is no more reasonable suspicion, and, as a general matter, continued questioning thereafter unconstitutionally prolongs the detention." *Lopez-Moreno* at 431. The stop may continue if "the Government can show an exception to the Fourth Amendment." *United States v. Peña-Gonzales*, 618 Fed. App'x 195, 198 (5th Cir. 2015) (quoting *Rodriguez*, 135 S.Ct. 1609, 1614 (2015)) (quotations and alterations omitted). A common exception derived from *Terry* permits extension of the stop if reasonable suspicion of additional criminal activity emerges or existed in the first place. *Id.*

Reasonable suspicion requires a "particularized and objective basis for suspecting the person stopped of criminal activity." *United States v. Chavez* 281 F.3d 479, 485 (5th Cir. 2002) (quotations omitted). It requires an amount of proof "considerably less than proof of wrongdoing by a preponderance of the evidence" and "obviously less than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014) (quotations omitted). If additional grounds for suspicion emerge, the stop may extend "as long as is reasonably necessary" to resolve such suspicion. *United States v. Fishel*, 467 F.3d 855, 856 (5th Cir. 2006) (quoting *Brigham*, 382 F.3d at 512). A court's determination of the existence of reasonable suspicion requires an examination of "the totality of the circumstances in the situation at hand, in light of the individual officers' own training and experience." *United States v. Monsivais*, 848 F.3d 353, 357 (5th Cir. 2017) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotations omitted).

### B. Application

At the hearing on this motion and in his post motion brief Richard argues that the stop was unlawful, and the subsequent search and seizure illegal, because it failed to satisfy the two prongs promulgated by the Supreme Court in *Terry*. Doc. 27. Specifically, he argues the stop was unjustified at its inception because Trooper Leger lacked reasonable suspicion as mandated by

*Terry*. *Id.* In support of this argument, he claimed that Trooper Leger's stated reasons for stopping Richard lacked evidentiary support. *Id.* Counsel for Richard argued that there is insufficient proof to establish Trooper Leger's reasonable suspicion of Richard's commission of the alleged traffic violations because they were not captured on Trooper Leger's dashcam. Doc. 27, pp. 2-4. Richard also argues that Trooper Leger unlawfully extended the stop because his choice to continue to question Richard and prolong the detention was not reasonably related in scope to the alleged traffic violations. *Id.* at 4-8. Additionally, counsel for Richard argues that Trooper Leger did not have reasonable suspicion to prolong the stop because the factors cited by Trooper Leger merely led to a "hunch" insufficient to establish reasonable suspicion. Doc. 27, p. 7.

The government argues that Richard's motion to suppress [doc. 20] should be denied because the stop was initially justified by Richard's traffic and equipment infractions and the use of the canine was supported by reasonable suspicion which gave Trooper Leger probable cause to search Richard's vehicle. *See generally* Doc. 22. Additionally, the government argues that the traffic stop was not unlawfully prolonged because the canine alerted prior to the completion of Trooper Leger's routine criminal history check. *Id.* at 16. We agree with the government for the reasons stated below.

The stop was justified at its inception because Trooper Leger cited two traffic infractions as his reason for initiating the traffic stop. *Id.* at 1. Namely, Trooper Leger testified that Richard was following another vehicle too closely in violation of LA. REV. STAT. § 32:81 and that Richard's license plate was obstructed in violation of LA. REV. STAT. § 32:53(A)(3)[1]. *Id.* Because Trooper Leger's testimony that Richard was following the vehicle ahead of him too closely is uncontroverted, it satisfies the first prong of the *Terry* analysis. It is irrelevant that there is a lack

---

[1] We do not agree that defendant's license plate was obstructed as contemplated by the statute. Given our conclusion as to the other infraction, however, this is of no moment.

of dashcam footage. As the government notes in its brief, "dash-camera footage, while helpful at times, will not always capture a traffic violation." Doc. 22, p. 9. Trooper Leger testified that the dashcam does not save what it records unless the emergency flashers are activated. Once the emergency flashers are activated, the dashcam saves the fifteen seconds recorded prior to the activation of the emergency flashers in addition to what is captured while the flashers are activated. Trooper Leger testified that he did not activate his emergency flashers while stationed in the median immediately after seeing the violation because, in his experience, he felt that doing so would be unnecessarily dangerous. Furthermore, the dash camera footage substantiates Trooper Leger's testimony because it shows the vehicle "changing lanes from the center lane into the right-hand lane moving directly in front of what appears to be a truck or a flatbed . . . the flatbed trailer that Trooper Leger referenced." *Id.* The fact that Trooper Leger had an objectively reasonable suspicion that Richard committed the traffic violation satisfies the first prong of the *Terry* test.

Finally, the stop satisfies the second element of the *Terry* framework because Trooper Leger had reasonable suspicion of additional criminal activity. At the hearing on this motion, Trooper Leger testified to his extensive experience and training regarding drug trafficking. Additionally, he testified as to Richard's specific behaviors that raised his suspicions. Specifically, he noted Richard's statement about his itinerary that was inconsistent with what was captured by the computer system. Richard stated at the scene that he was coming from his job in Vinton, Louisiana, when the computer system showed that he had crossed the border into Texas earlier in the day and that he crossed from Texas into Louisiana only a short time prior to the stop. *Id.* at 2. Trooper Leger considered Richard's misstatement with the "totality of the circumstances at hand," specifically, his presence in a major drug trafficking corridor, his display of numerous indicia of nervous behavior, and his conflicting/inaccurate statements about his employment. *Id.* at 10-11.

Trooper Leger also cited Richard's failure to answer questions and general nervousness when asked about the duffel bag, Richard's appearance of attempting to hide something inside of the duffel bag when showing Trooper Leger its contents, as well as Richard's shakiness when opening the bag and the pulsation of his carotid artery. *Id.* at 11. Trooper Leger testified that his experience and training led him to suspect that Richard was involved in drug trafficking based on such behaviors.

Therefore, we conclude that under "the totality of the circumstances at hand, in light of [Trooper Leger's] own training and experience" with regard to drug trafficking, Trooper Leger had reasonable suspicion to believe that Richard was involved in drug trafficking. *Monsivais*, 848 F.3d at 357 (quoting *Arvizu*, 534 U.S. at 273) (internal quotations omitted). As such, Trooper Leger had the ability to extend the stop "as long as [was] reasonably necessary" to resolve his suspicion that Richard was involved in drug trafficking. *Fishel*, 467 F.3d at 856 (quoting *Brigham*, 382 F.3d at 512). We find that the stop was not unreasonably prolonged and that the search and seizure of the kilogram of cocaine did not violate the Fourth Amendment.

### III.
#### CONCLUSION

For the reasons stated above, **IT IS RECOMMENDED** that the Motion to Suppress [doc. 20] is **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days from receipt of this Report and Recommendation to file written objections with the Clerk of Court. Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days of receipt shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon

grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1429–30 (5th Cir. 1996).

      THUS DONE this 24th day of July, 2019.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE